IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. HERBERT DWAYNE TILEY, Appellant. | No. 85668-5-I DIVISION ONE UNPUBLISHED OPINION |

COBURN, J. — After a confrontation in a pub with Joseph Harrington, Herbert Dwayne Tiley placed a sparkler bomb underneath Harrington's vehicle that was later retrieved and dismantled to render safe. Following a bench trial, Tiley was convicted of the crimes of attempted assault in the first degree with a deadly weapon (the sparkler bomb), malicious placement of an explosive in the second degree, possession of an explosive device, and harassment. Because, under Blockburger,[1] the State relied on the same evidence to support Tiley's convictions for possession of an explosive device and malicious placement of an explosive in the second degree, we vacate the lesser offense of malicious placement of an explosive in the second degree to avoid double jeopardy. In a statement of additional grounds, Tiley asserts that the court's finding that the sparkler bomb was an explosive device was based on insufficient evidence, that the

---

[1] Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

trial court erred in denying his motion to arrest judgment, and that his convictions should be reversed because of mishandled evidence. None of these assertions have merit. Accordingly, we affirm in part, reverse in part, and remand for resentencing.

FACTS

In September 2020, Harrington, his wife, and his friend Wayne Matthias and others were at Scotty's Grub and Pub. Tiley, who was known to Harrington but not a friend, was also at the bar. Harrington told Tiley to "shut the fuck up and leave us alone" after Tiley repeatedly interjected himself verbally toward Harrington's party and made racially-charged comments related to what was playing on a television. After this demand Harrington immediately went outside to smoke, while Matthias heard Tiley say "You're fucking dead," and "You're a dead man" before running out of the bar and across a street. Tiley narrowly avoided being hit by a car driven by Pat Ward, an acquaintance and former neighbor of Harrington's. Ward saw Tiley continue across the street, jump into a white pickup truck, and drive away.

At some point shortly afterward, Tiley arrived back in the area outside of the pub when Harrington was inside and Matthias was outside in the adjacent alley. Tiley made threatening statements about his intentions for Harrington to Matthias and others, including a reference to showing Harrington "the business end of an AK," and then departed in his truck. Matthias went inside the bar and relayed the threats Tiley made.

About half an hour after nearly hitting the defendant as he ran across the street, Ward returned to the area and parked. Ward saw Tiley pull up, park, and then exit his truck holding a "red item" about 10 inches long in his hand. Tiley hid against a wall and peeked around as he walked down the sidewalk and made his way to Harrington's

2

distinctive red Ford Ranger with South Dakota license plates. Tiley crawled underneath the truck with the red item and remained there for two to three minutes. Tiley came out from underneath the truck and no longer had the red item. Tiley then ran back to his truck and quickly drove away.

Ward found Harrington outside of the pub and told him what he had seen. They looked under Harrington's truck along with Matthias, and saw the red item placed atop the truck's catalytic converter and exhaust manifold. Matthias recognized the red item as a sparkler bomb with metal stems sticking out of the end. Matthias told Harrington to call 911, which he did. Pierce County Sheriff's Hazardous Device Squad secured the device using a pulley system from under the vehicle, placed it in an anti-static Kevlar-lined box and transported it to the bomb squad's vault until it was later rendered safe by using a ceramic knife to slice open the tape and vent the sparklers. Officers observed at least 130 sparklers inside the bomb. The recovered sparkler bomb was not tested to determine chemical composition or any other properties of the sparklers or the tape. Tiley was arrested at his home. A search warrant executed on Tiley's home uncovered several firearms (including a loaded AK-style rifle), ammunition, and fireworks.

The State charged Tiley, by amended information, with attempted murder in the first degree, assault in the first degree with a deadly weapon, attempted assault in the first degree with a deadly weapon, malicious placement of an explosive in the second degree, unlawful possession of an explosive device, and felony harassment.

Tiley waived his right to a jury trial. At trial, the State presented witnesses who testified about how sparklers can be used to create bombs. According to the unchallenged findings of fact, "[s]parklers are a metal or wood stick containing a

3

pyrotechnic mixture on one end . . . the pyrotechnic mixture on a sparkler contains an oxidizer, fuel, and combustible material" that "can be ignited by fire, friction, or static." When packed into a sparkler bomb and held together tightly, "the gases or gaseous pressures created by the burning sparklers in that confinement get hot, and if the pressure overcomes the force confining the sparklers can then explode, producing . . . destructive effects on contiguous objects." The deputy who examined the device recognized, based on his training and experience, that the sparklers used in the device contained an oxidizer, fuel, and combustible material. The sparkler bomb placed under Harrington's vehicle was intended to ignite through heat or fire. There was "nothing missing" from the sparkler bomb that would have prevented it from exploding.

Defense presented an explosives expert witness who testified that, based on photographic evidence of the condition of the bomb and a guess at the likely chemical composition of the sparklers, the device was likely incapable of igniting and thus could not cause property damage or injury. The expert conceded that for a sparkler bomb confined by tape, factors such as the exact nature of the oxidizer, metal fuel, and tightness of confinement will dictate the energetic properties of the bomb.

The court entered 284 findings of fact, including finding that the "sparkler bomb . . . was an explosive," as well as "an explosive device, containing approximately 130 sparklers which contained both an oxidizer and fuel, wrapped tightly in red tape with one sparkler protruding from the group of sparklers to act as a fuse." The court also found that it "was doubtful that the sparkler bomb would have exploded from the heat of the catalytic converter," and that the "sparkler bomb did not have a present ability to inflict bodily injury if not prevented from exploding."

4

The court found Tiley not guilty of attempted murder in the first degree and assault in the first degree. The court found Tiley guilty of attempted assault in the first degree while armed with a deadly weapon that is an explosive. The court also found Tiley guilty of malicious placement of an explosive in the second degree while armed with a deadly weapon, and possession of an explosive device. Though the court found Tiley not guilty of felony harassment, it did find him guilty of the lesser included crime of harassment.

Tiley filed a motion to arrest judgment for the conviction of attempted assault in the first degree, arguing that the information failed to charge a crime under Washington law. The court denied the motion. At sentencing, Tiley maintained that the convictions for malicious placement of an explosive and unlawful possession of an explosive device were based on the "same criminal conduct." The court disagreed. Tiley received a standard range sentence for his convictions and two deadly weapon enhancements. Though the court found Tiley indigent and waived any discretionary legal financial obligations, an appendix to the judgment and sentence reflected that the court ordered community supervision fees.

Tiley appeals.

DISCUSSION

Double Jeopardy

The double jeopardy clauses of the federal constitution's Fifth Amendment and the Washington State Constitution protect a defendant from multiple punishments for the same offense. State v. Calle, 125 Wn.2d 769, 772, 888 P.2d 155 (1995); U.S. Const. amend. V; Wash. Const. art. I, § 9. Because the legislature "has the power to

define offenses and set punishments," double jeopardy is not offended if the legislature "intended to punish separately" crimes that constitute the same criminal act. State v. Freeman, 153 Wn.2d 765, 771, 108 P.3d 753 (2005). Where an act of the defendant results in charges under multiple criminal statutes, a double jeopardy challenge requires the court to determine whether, in light of legislative intent, the charged crimes constitute the same offense. In re Pers. Restraint of Orange, 152 Wn.2d 795, 815, 100 P.3d 291 (2009). A double jeopardy claim is a question of law that is reviewed de novo. State v. Jackman, 156 Wn.2d 736, 746, 132 P.3d 136 (2006). Claims of manifest error affecting the double jeopardy right may be raised for the first time on appeal. RAP 2.5(a).

Tiley contends that his convictions for malicious placement of an explosive in the second degree and possession of an explosive device violate double jeopardy. Tiley asserts that maliciously placing the sparklers under Harrington's truck necessarily established that he possessed the sparklers and caused the device to be used for an unlawful purpose. Thus, he argues, the two crimes constitute an identical offense, in law and fact, under the 'same evidence' test of Blockburger. We agree.

"To determine whether the legislature intended to punish crimes separately, we apply the four-part test enunciated in State v. Freeman." State v. Fuentes, 150 Wn. App. 444, 449, 208 P.3d 1196 (2009) (citing Freeman, 153 Wn.2d at 765)).

> First, we look at the statutory language to determine if separate punishments are specifically authorized. If we cannot ascertain this from the language itself, we next apply the "same evidence" test. Under that test, we ask whether one offense includes an element not included in the other and proof of one offense would not necessarily prove the other. If that is the case, we presume that the crimes are not the same for double jeopardy purposes. Third, if applicable, we use the merger doctrine to determine legislative intent even if two crimes have formally different

elements. Finally, even if on an abstract level the two convictions appear to be for the same offense or for charges that would merge, we must determine whether there is an independent purpose or effect for each offense. If so, they may be punished as separate offenses without violating double jeopardy.

Id. at 449-50 (citations omitted). "Sometimes, there is sufficient evidence of legislative intent that we are confident concluding that the legislature intended to punish two offenses arising out of the same bad act separately without more analysis." Freeman, 153 Wn.2d at 772 (citing as example Calle, 125 Wn.2d at 777-78 (rape and incest are separate offenses)).

The State concedes that "there is no express articulation of legislative intent to punish each pair of crimes separately." Neither party suggests there otherwise exists evidence of legislative intent as to these two crimes. We therefore turn to the remaining steps under the Freeman analysis, starting with the Blockburger test. Id. (citing Blockburger, 284 U.S. at 304, as establishing "same evidence" or the "same elements" test). This test applies where the "same act or transaction" constitutes a "violation of two distinct statutory provisions." Id. The analysis asks whether the crimes as charged and proven are "identical both in fact and in law." Calle, 125 Wn.2d at 777.

Though a presumption exists that crimes are not the same offense for double jeopardy purposes when each contains an element the other does not, the Blockburger analysis does not just compare statutory elements at their most abstract level. In re Orange, 152 Wn.2d at 818. "[D]ouble jeopardy will be violated where '*the evidence required* to support a conviction upon one of [the charged crimes] would have been sufficient to warrant a conviction upon the other.'" Id. at 820 (second alteration in original) (internal quotation marks omitted) (quoting State v. Reiff, 14 Wash. 664, 667,

7

45 P. 318 (1896)).  Two crimes are not the same in fact if one crime begins after the other is completed, and thus different evidence supports each conviction.  State v. Davis, 174 Wn. App. 623, 633, 300 P.3d 465 (2013) (citing State v. Noltie, 116 Wn.2d 831, 848, 809 P.2d 190 (1991)).

For malicious placement of an explosive in the second degree, the State had to prove Tiley "maliciously" placed an explosive or improvised device upon or under a car, in such a manner or under such circumstances as to destroy or injure the car, and endanger the safety of any person if exploded.  RCW 70.74.270(2).

> "Malice" and "maliciously" shall import an evil intent, wish, or design to vex, annoy, or injure another person.  Malice may be inferred from an act done in willful disregard of the rights of another, or an act wrongfully done without just cause or excuse, or an act or omission of duty betraying a willful disregard of social duty[.]

RCW 9A.04.110(12).  The crime of possession of an explosive device requires that Tiley have in his "possession or control any shell, bomb, or similar device, charged or filled with one or more explosives, intending to use it or cause it to be used for an unlawful purpose."  RCW 70.74.180.

The State agrees that in maliciously placing an explosive, one has to possess it, but contends that Tiley completed the crime of possession of an explosive device before committing the crime of malicious placement.  The State argues it "clearly relied upon different evidence" to prove each of the crimes because it presented a witness who saw that Tiley had possession of the explosive device as he was going to place it underneath Harrington's truck.

The State argues that the instant case is analogous to Davis.  In Davis, the State relied on different evidence to prove two crimes committed in a short span of time, and

the court accordingly held that the offenses were not the same in fact. 174 Wn. App. at 633. The first crime of assault was committed when Davis used a handgun to engage and wound a police deputy in a shootout from a cabin deck. Id. at 630. Then, "[a]fter 15 to 20 seconds" of said shootout, the defendant stopped firing the handgun, walked into the cabin to retrieve a shotgun, and immediately reengaged the police deputy, walking toward the cover the deputy had taken and pointing the shotgun. Id. This sequence of events supported an attempted murder charge for retrieving the shotgun, approaching, and aiming the shotgun after the initial shootout, because "not only did the State explicitly rely on separate evidence to support each crime, the jury was instructed that it must unanimously agree that the specific sequence of acts relied on was proved beyond a reasonable doubt . . . therefore, the crimes were not the same in fact." Id. at 633-34.

While the State in Davis relied on different evidence to support each crime, the State in the instant case relied on the same evidence to support both crimes. Whereas it is true that Ward saw Tiley possess something that later turned out to be the sparkler bomb, possession of the explosive device was not unlawful unless and until there is evidence that Tiley intended to use it or caused it to be used for an unlawful purpose. During closing arguments, the State argued that the device was clearly in Tiley's possession and

> He intended to use [the sparkler bomb] or cause it to be used for an unlawful purpose. Blowing up Joe Harrington's truck is a pretty unlawful purpose. Killing Joe Harrington is an unlawful purpose in Washington.
> . . .
>
> Pat Ward saw [Tiley] get out of his truck with the red device in his hands. He saw him cross the street, walk down Stewart, peek down the alley, all with the red device in his hands, crawl under Joe Harrington's truck; and

9

when he crawled out from underneath it, it was no longer in his hands. That device was in the defendant's possession; it was in his actual physical custody. It was filled with explosives, and he intended to use it for an unlawful purpose. He intended to use it to blow up Joe Harrington's truck and to kill Joe Harrington. He said he was going to kill Joe.

. . .

There is no lawful purpose that the defendant had in planting that device underneath Joe Harrington's truck. The State has proved beyond a reasonable doubt that the defendant is guilty of possession of an explosive device.

The State's closing argument makes clear that the evidence required to support a conviction of malicious placement of an explosive in the second degree would have been sufficient to warrant a conviction upon the other – possession of an explosive device – because the State relied on the placement of the explosive device to establish that Tiley had possessed it for an unlawful purpose. We reject the State's contention that Tiley, like the defendant in Davis, completed one crime before committing the other.

The State also relies on State v. Grantham, 84 Wn. App. 854, 932 P.2d 657 (1997), to assert that Tiley "had an opportunity to pause and reflect prior to placing the sparkler bomb." Grantham applied the "same criminal conduct" analysis for the purposes of sentencing. The State asserts without any supporting authority that "[i]n deciding whether crimes occurred sequentially or simultaneously for double jeopardy analysis, courts look to the same factors identified in RCW 9.94A.589(1)(a) for 'same criminal conduct.'" Though Blockburger and RCW 9.94A.589(1)(a) have similar qualities,[2] the State conflates the two tests. See State v. French, 157 Wn.2d 593, 611-12, 141 P.3d 54 (2006) (holding that double jeopardy and same criminal conduct

---

[2] For the purposes of sentencing, "[t]wo crimes against a single victim constitute the 'same criminal conduct' if they (a) involve the same criminal intent; (b) were committed at the same time; and (c) were committed at the same place. Grantham, 84 Wn. App. at 857-58. Grantham applied RCW 9.94A.400(1)(a) that has been re-codified as RCW 9.94A.589.

analyses are distinct and separate inquiries). The State appears to suggest that because the court concluded the crimes were not based on the same criminal conduct based on a finding that Tiley had an opportunity to pause and reflect while possessing the device before placing it,[3] then the crimes also do not violate double jeopardy.

As we have discussed above, Tiley did not complete the crime of possession of an explosive device until he demonstrated that he possessed it for an unlawful purpose. The evidence of the unlawful purpose was placing the device underneath someone else's truck. Thus, whether Tiley had an opportunity to pause and reflect while in possession of the device before placing it underneath the truck is of no matter. Not only is Grantham not a double jeopardy case, its facts are distinguishable. Grantham involved two convictions of the crime of rape, with a short period of time between each where, the court concluded, the defendant formed a new intent to commit a second rape. Grantham, 84 Wn. App. at 859. The court noted that Grantham had an opportunity to reflect and cease criminal activity, had the presence of mind to listen to and ignore the victim's pleas, threatened the victim anew, and then "had to use new physical force" to accomplish the second rape. Id. The Grantham court noted that "[t]he crimes were sequential, not simultaneous or continuous. The evidence also supports the trial court's conclusion that each [criminal act] was complete in itself; one did not depend upon the other or further the other." Id. The State's reliance on Grantham is unavailing.

Next, the State asserts the crimes have different victims because the "plain language of the malicious placement of an explosive device in the second degree

---

[3] Tiley also challenges the court's same-criminal-conduct ruling, which we need not address because of our double jeopardy holding.

11

statute identifies one specific victim – the owner of the property that the defendant places the explosive 'upon, under, against, or near' with the malicious intent of destroying or injuring said property."

The plain language of the statute does not require identifying a specific victim. It requires the explosive device be placed upon or under a car, in such a manner or under such circumstances as to destroy or injure the car, and endanger the safety of "any person" if exploded and that the person placing the device does so maliciously, meaning with an evil intent, wish, or design to vex, annoy, or injure another person. RCW 70.74.270(2). While malice can be inferred from an act done in willful disregard of the rights of another, it also can be inferred from "an act wrongfully done without just cause or excuse, or an act or omission of duty betraying a willful disregard of social duty." RCW 9A.04.110(12). Notably, the State also concedes that the "risk that the device, if exploded, may endanger the safety of one or more persons is a by-product of the crime rather than its goal."[4]

More importantly, "we do not consider the elements solely in the abstract; we consider the elements as the State charged and proved the offenses." Davis, 174 Wn. App. at 633 (quoting Freeman, 153 Wn.2d at 777). The State did not identify any specific victim for either crime in the amended information. Though the trial was not heard before a jury, both the State and Defense proposed jury instructions because there are no existing Washington pattern jury instructions for either the malicious

---

[4] The State made this statement in support of its argument that the crime of malicious placement of an explosive and attempted assault in the first degree have different victims. This was in response to Tiley's assertion that his convictions for the malicious placement crime and attempted assault in the first degree violated double jeopardy. The State correctly pointed out that, unlike the malicious placement crime, attempted assault in the first degree required proof that Tiley intended to target Harrington.

placement crime or the crime of possession of an explosive device. The court worked primarily off of the State's proposed jury instructions, which are not in the record before us. However, the record does indicate that defense did not take exception to the State's proposed to-convict jury instruction for the crime of malicious placement of an explosive, which the State referred to during closing argument without objection. The State highlighted the elements as

> that on or about the 6th day of September, 2020, the defendant maliciously placed an explosive or improvised device on or under a car, that the defendant placed the explosive or improvised device in such a manner or under such circumstances as to destroy or injure the car, if exploded, that the safety of *any person* might have been endangered by the explosion if it exploded in Washington.

(Emphasis added.) The court elected to use the defense to-convict instruction number 41 for the crime of possession of an explosive device because it "mirrored the statute pretty well." The State did not object. The instruction required the State prove, among other elements, that "the defendant intended to use or cause the shell, bomb, or similar device to be used for an unlawful purpose." The to-convict instruction did not require the State to identify a specific victim.

Though the State argued that Tiley's action was malicious toward Harrington, malice can be inferred from an act done in willful disregard of the rights of another or an act wrongfully done without just cause or excuse, or an act or omission of duty betraying a willful disregard of social duty. RCW 9A.04.110(12). The State emphasized at trial that the issue was whether there was "endangerment of any person" and that witness testimony established several people other than Harrington also were endangered.

The fact that the State did argue that Harrington was the target of Tiley's maliciousness does not change the Blockburger test or our conclusion that, "'*the*

13

*evidence required* to support a conviction upon one of [the charged crimes] *would have been sufficient* to warrant a conviction upon the other.'" Orange, 152 Wn.2d at 820 (second emphasis added) (alteration in original) (quoting State v. Reiff, 14 Wash. at 667). See State v. O'Connor, 87 Wn. App. 119, 125, 940 P.2d 675 (1997) (holding that convictions for possession of controlled substance and possession of a controlled substance with intent to deliver violated double jeopardy where the convictions were based on a single search of the defendant producing several different quantities of drugs hidden on his person and within arm's reach in various places).

Through our Blockburger analysis, we conclude that the two convictions are the same in the law and in fact. Because the merger doctrine does not apply here,[5] we next look to the existence of an "independent purpose or effect." Independent purpose or effect is "a well[-]established exception that may operate to allow two convictions even when they formally appear to be the same crime under other tests." Freeman, 153 Wn.2d at 778. The exception applies where there is a separate injury to "the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element." Id. (quoting State v. Frohs, 83 Wn. App. 803, 807, 924 P.2d 384 (1996)). "This exception is less focused on abstract legislative intent and more focused on the facts of the individual case." Id. at 779. See

---

[5] While the merger doctrine is "[a]nother tool for determining legislative intent in the context of double jeopardy," it is only applicable

> where the Legislature has clearly indicated that in order to prove a particular degree of crime (*e.g.*, first degree rape) the State must prove not only that a defendant committed that crime (*e.g.*, rape) but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes (*e.g.*, assault or kidnapping).

Freeman, 153 Wn.2d at 777-78 (quoting State v. Vladovic, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983)).

State v. Arndt, 194 Wn.2d 784, 819, 453 P.3d 696 (2019) (holding that the convictions for murder in the first degree with an arson aggravator and arson in the first degree based on a single act of starting a house fire were the same under Blockburger, but the "presence of additional victims places this case inside the 'independent effect' exception to the merger doctrine that allows for the imposition of separate punishments"). Courts also have considered the primary purpose of the relevant crimes. See Arndt, 194 Wn.2d at 820 (observing that the crimes of arson and first degree murder are set in different parts of the criminal code with different primary purposes). But the "same evidence" test from Blockburger should only be overcome by "clear evidence of contrary intent." Calle, 125 Wn.2d at 780.

The State does not present any argument that an independent purpose or effect overcomes the result of the Blockburger test that the crimes are the same.[6] Accordingly, we hold that, under the facts of this case, Tiley's convictions for maliciously placing an explosive in the second degree and possession of an explosive device violate double jeopardy.

We next determine which offense is the lesser offense. The remedy for a double jeopardy violation is to vacate "the lesser offense." State v. Hughes, 166 Wn.2d 675, 686 n.13, 212 P.3d 558 (2009). "The lesser offense is determined primarily by which conviction has the shorter sentence, but courts have also considered other factors such as the seriousness level and the degree of the offense." Id. The parties agree that malicious placement of an explosive in the second degree is the lesser offense.

---

[6] The only argument the State presented as to independent purpose and effect related to the crimes of attempted assault in the first degree and malicious placement of an explosive in the second degree.

15

Malicious placement of an explosive device in the second degree is a class B felony and a seriousness level "IX" offense. RCW 70.74.270(2); RCW 9.94A.515. This offense is a "nonviolent offense." RCW 9.94A.030(33). Possessing an explosive device is a class A felony and a seriousness level "IX" offense. RCW 70.74.180; RCW 9.94A.515. This offense is a "violent offense." RCW 9.94A.030(58)(i). We vacate Tiley's conviction of malicious placement of an explosive in the second degree.

### Statement of Additional Grounds

In his statement of additional grounds, Tiley first argues that the State "failed to establish beyond a reasonable doubt" that he possessed an explosive device "because unless . . . packaged in a particular manner sparklers are not explosives." (citing RCW 70.74.180 ("any shell, bomb, or similar device, charged or filled with one or more explosives . . .")). We reject this claim.

When reviewing a challenge to sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). "Specifically, following a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusion of law." State v. Homan, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). "Substantial evidence" is that evidence which is sufficient to persuade a fair-minded person of the truth of the asserted premise. Id. at 106. All inferences are resolved in favor of the prosecution. State v. Maxey, 63 Wn. App. 488, 491, 820 P.2d 515 (1991).

16

Tiley argues that the bundle of sparklers was not "charged or filled" with one or more explosives as required by the statute because "even if a sparkler bomb is considered an explosive the sparkler itself is not."  "Explosive" or "Explosives" shall be held to mean and include

> any chemical compound or mechanical mixture that is commonly used or intended for the purpose of producing an explosion, that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing, that an ignition by fire, by friction, by concussion, by percussion, or by detonation of any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures are capable of producing destructive effects on contiguous objects or of destroying life or limb.

RCW 70.74.010(5).  The trial court made the following relevant findings:

- The Pierce County Hazardous Device Squad officers observed approximately 130 sparklers inside the sparkler bomb after it had been sliced open in a "render safe" procedure.

- "Sparklers are a metal or wood stick containing a pyrotechnic mixture on one end . . . the pyrotechnic mixture on a sparkler contains an oxidizer, fuel, and combustible material" that "can be ignited by fire, friction, or static."

- The substance of the sparklers contained both "oxidizing and combustible units."

Witness testimony supported the court's findings.  Expert witnesses for both the prosecution and defense testified that when sparklers are packed and held together tightly, "the gases or gaseous pressures created by the burning sparklers in that confinement get hot, and if the pressure overcomes the force confining the sparklers can then explode, producing . . . destructive effects on contiguous objects."  The Pierce County Hazardous Device Squad officers who recovered the sparkler bomb from Harrington's vehicle and performed the render safe procedure on it testified that it was

consistent in all its visible details and construction with sparkler bombs they had handled before, which they understand to be dangerous explosives.

From this evidence and testimony, the trial court found that the sparkler bomb placed under Harrington's truck could have been ignited through heat, fire, or friction, that it would have inflicted great bodily harm on those nearby if it exploded, that there was nothing missing from the sparkler bomb that would have prevented it from exploding, and that it was an explosive as defined in RCW 70.74.010(5).

Tiley points out that the recovered sparkler bomb was not sent for testing to determine chemical composition or other properties of the sparklers or the tape they were wrapped in.[7]  To support his argument that the evidence was insufficient to find the sparkler bomb was "charged or filled with explosives," Tiley points to the testimony of his expert witness Anthony May who stated that because no testing was done on the sparklers, it was impossible to know what oxidizer was used, and that recent oxidizers used by the fireworks industry are "not as energetic . . . its common purpose . . . is to burn versus explode."

This court rejected a similar argument in State v. Harrell, 83 Wn. App. 393, 405, 923 P.2d 698 (1996).  There, the defendant argued that "[w]ithout [chemical] testing and precise measurement, there can be no proof beyond a reasonable doubt . . . [and so] the trial court's finding that the object was an explosive device was not supported by substantial evidence."  Id.  We observed in Harrell that no Washington case supports this contention.  That observation still holds true.

---

[7] Tiley concedes that the State's failure to test the sparkler bomb creates reasonable doubt.  The court found it "doubtful that the sparkler bomb would have exploded from the heat of the catalytic converter."  The court found that the "sparkler bomb did not have a present ability to inflict bodily injury."

Moreover, May also stated that "[a]ny energetic mixture, regardless of [the oxidizer used], if it's given the proper confinement, it has the potential of creating enough energy and, if that confinement is held long enough, could result in an explosion."  The evidence, viewed in the light most favorable to the State, is sufficient to support the trial court's finding, beyond reasonable doubt, that

> [T]he sparkler bomb was an explosive in that it contained a chemical compound or mechanical mixture commonly used or intended for the purpose of producing an explosion, it contained any [sic] oxidizing and combustible unit, or other ingredients, in such proportions, quantities or packing that an ignition by fire, by friction, or by detonation of any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures were capable of producing destructive effects on contiguous objects or of destroying life or limb.

Tiley next asserts that "this court should dismiss this case" because evidence was mishandled and damaged.  Tiley refers to a sparkler stem that stuck out from the pack which appears to be damaged in evidence photographs.  None of the witnesses could identify when and how the sparkler became damaged.  The damaged sparkler was of the same type as the other undamaged sparklers bundled in the sparkler bomb, many others of which also had their stems exposed.

"Absent an affirmative showing that the evidence had exculpatory value, the State's failure to preserve 'potentially useful' evidence does not violate a criminal defendant's right to due process of law unless the police acted in bad faith."  State v. Floyd, No. 42396-1-II, slip op. at 24 (Wash. Ct. App. Dec. 17, 2013) (published in part), https://www.courts.wa.gov/opinions/pdf/D2%2042396-1-II%20%20Part-Published%20Opinion.pdf (quoting State v. Straka, 116 Wn.2d 869, 884, 810 P.2d 888 (1991)).  Even assuming, without deciding, that the damaged sparkler was damaged

19

after police obtained the device, Tiley does not affirmatively show the exculpatory value of that single damaged sparkler when there were approximately 130 undamaged sparklers. We conclude that Tiley has not established a basis to reverse his convictions and dismiss his case because of the existence of one damaged sparkler.

Lastly, Tiley argues that the trial court erred in denying his motion to arrest judgment on his conviction for attempted assault in the first degree because "there is no such crime." "Judgment may be arrested on the motion of the defendant for the following causes . . . the indictment or information does not charge a crime." CrR 7.4(a)(2). Whether a complaint or information actually alleges a crime is a question of law which is reviewed de novo.[8] State v. Engel, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009); See City of Seattle v. Morrow, 45 Wn.2d 27, 31-33, 273 P.2d 238 (1954) (comparing the language of the criminal statute with the language in the complaint in defendant's motion in arrest of judgment for failure to state a crime).

Tiley, citing State v. Music, 40 Wn. App. 423, 698 P.2d 1087 (1985), argues that "Division One and Three of this Court have already concluded that an individual cannot commit attempted assault under either the battery or the attempted battery definitions of assault." Tiley misconstrues Music. In Music this court recognized that one means of committing assault is an attempt to commit battery and some courts have concluded that alleging an attempt to attempt to commit a battery is illogical. Id. at 432. Division Three, in State v. Hall, agreed. 104 Wn. App. 56, 64-65, 14 P.3d 884 (2000). The concerns raised in Music and Hall are distinguishable from circumstances when the

---

[8] Compare CrR 7.4(a)(3) that provides for a motion to arrest judgment for "insufficiency of the proof of a material element of the crime." When reviewing the motion under this subsection, this court may only test or examine the sufficiency of the evidence. State v. Randecker, 79 Wn.2d 512, 517, 487 P.2d 1295 (1971).

completed crime is different than taking a substantial step towards completing that crime. See State v. Austin, 105 Wn.2d 511, 516, 716 P.2d 875 (1986) (explaining State v. Hansford, 22 Wn. App. 725, 591 P.2d 482 (1979)).

"In Hansford, the court held the State could charge the defendant with attempted extortion under the general attempt statute (RCW 9A.28.020) even though there was a specific statute defining extortion as knowingly obtaining or attempting to obtain the property or services of the owner by a threat (RCW 9A.56.110)." Austin, 105 Wn.2d at 515-16. "Defendant Hansford was charged with taking a 'substantial step toward [RCW 9A.28.020] knowingly attempting to obtain property from the owner thereof . . . '" Id. at 516 (citing Hansford, 22 Wn. App. at 727). The Supreme Court observed that in Hansford, "the completed crime of extortion required an actual threat, not an attempted threat; the defendant's note in Hansford constituted an attempted threat and, thus, was a crime only pursuant to the general attempt statute, RCW 9A.28.020." Id. This was different than when the attempt was the actual completed crime. Id.

In the instant case, the completed crime of assault in the first degree required that Tiley intentionally assault Harrington with a deadly weapon or by any force or means likely to produce great bodily harm or death. The State charged Tiley with attempted assault in the first degree based on the general attempt statute, RCW 9A.28.020, not an allegation that Tiley attempted to attempt battery. We reject Tiley's assertion that the State charged and convicted Tiley of an act that is not a crime and affirm the trial court's denial of the motion to arrest judgment.

CONCLUSION

We hold that, under these facts, the convictions for possessing an explosive device and maliciously placing an explosive in the second degree violate double jeopardy, and vacate the latter because it is the lesser offense.[9]  Sufficient evidence supports the trial court's finding that Tiley possessed an explosive device.  The trial court did not err in denying Tiley's motion to arrest judgment.  Tiley does not establish a basis for relief as to his other claim in his statement of additional grounds.

We affirm in part, reverse in part, and remand for resentencing.[10]

_Coburn, J._

WE CONCUR:

_Feldman, J._            _Chung, J._

---

[9] Because we vacate the crime of malicious placement of an explosive in the second degree, we need not consider Tiley's argument that the malicious placement conviction in conjunction with the conviction for attempted assault in the first degree placed Tiley in double jeopardy.

[10] Since we remand for resentencing, we need not address the parties' agreement that the community supervision fees should be stricken.  The parties on remand can alert the trial court that it had previously inadvertently imposed community supervision fees in an appendix to the judgment and sentence in what appears to be boilerplate language.  Community custody supervision fees were no longer authorized by RCW 9.94A.703 at the time of Tiley's sentencing. Laws of 2022, ch. 29, § 8.

22